# EXHIBIT E

**In the Matter of:**

*Randstad General Partner (US), LLC vs*

*Beacon Hill Staffing Group, LLC, et al*

---

*Shawna Bestreich*

*August 20, 2019*

---


*68 Commercial Wharf • Boston, MA 02110*

*888.825.3376 - 617.399.0130*

*Global Coverage*

*court-reporting.com*

O'BRIEN & LEVINE

COURT REPORTING SOLUTIONS

A. Okay. I went to school in Denver. I had a double major in finance and marketing.
**Q. University of Denver?**
A. University of Denver, small private school. From there I worked at a bank. I wanted to do finance. That lasted a good three months, I was miserable, went to work for a company called DiningOut Magazine where I was for three years selling ad space. They're all over, there're DiningOut all across the nation, and then like a luxury type magazine.
From there I was recruited to Onyx M.D., where I also worked for three years, so I guess that would be 2009, 2010, up until 2013. That was physician staffing, health care recruiting. When I was recruited to work at Supplemental Health Care, I moved to the Park City, Utah for that and was there for 2 1/2 years.
We're leaving, moving to Dallas, my husband obviously went through a divorce and his ex was moving back to Dallas, so that's why we're here. And shortly after I came to Dallas, Randstad had reached out to me and had recruited me for the position I ended up taking.
**Q. How did you go from a luxury magazine to a health care recruiting?**



A. So I -- it's Denver, very small community. I know a lot of people, was born and raised there. So one of my close friends, he knew I wasn't happy at DiningOut Magazine, I wasn't making very much money and I thought I wanted to progress my career. And his friend is an anesthesiologist and owned a company, and so that's how I got in there. And actually, one of Erik and my mutual friends was the CFO of that company.
**Q. Erik Adams?**
A. (Moving head up and down.)
**Q. Yes?**
A. Yes. Sorry.
**Q. And why did you leave Onyx to go to -- I think you said Supplemental Health Care?**
A. Yeah. They were going through a lot of changes. My --
**Q. Who's they?**
A. Onyx.
**Q. Okay.**
A. My boss who hired me, my team, ended up leaving the company and went to Supplemental Health Care, and, ultimately, brought me over there along with several other people that worked at Onyx, and it was obviously a promotion type role for me.



**Q. And that was health care recruiting as well?**
A. That was all health care, yeah, physician recruitment.
**Q. And then when you moved to Dallas, did you have to leave the Supplemental Health Care job or did you work from here?**
A. Yeah. So I -- they have an office here. I ended up leaving Supplemental Health Care. We moved here, I worked for one of my husband's friends who wanted to start a health care staffing company, and during that time is when Randstad contacted me.
**Q. How did they contact you?**
A. Randstad?
**Q. Yes.**
A. I don't remember. Probably through LinkedIn, I think.
**Q. One of their internal recruiters just reached out to you out of the blue and --**
A. Yeah. It was just totally out of the blue. Her name was Allison. She was out of Atlanta. So I think it had to be through LinkedIn.
**Q. Do you recall when you started working for Randstad?**
A. My start date was pushed back several times,



so I think it was in January of 2015, 2016. It was supposed to be December 2015, so I think it was January 2016.
(Exhibit No. 1 marked.)
**Q. Okay. So I've placed before you what's been marked as Exhibit 1. Do you recognize this?**
A. Yes.
**Q. What is it?**
A. My offer letter.
**Q. And does this refresh your memory about when you began at Randstad?**
A. Yes.
**Q. When was that?**
A. January of 2016.
**Q. Okay. And your title, according to this, was MC area vice president?**
A. When I started, yes.
**Q. Okay. What's MC?**
A. Mass Customize.
**Q. And did your title change during your --**
A. Yes.
**Q. -- stint at Randstad?**
A. (Moving head up and down.)
**Q. Tell me about that.**

**Q. Did you talk to anybody about it?**
A. No.
**Q. Has anybody ever told you that the agreement is unenforceable?**
MS. DEARING: Object to form.
A. No.
**Q. Do you believe it to be unenforceable?**
MS. DEARING: Object to form.
A. I guess I'm not at liberty to make assumptions like that, but...
**Q. Are you claiming in this case that it's unenforceable?**
MS. DEARING: Object to form.
A. No.
(Exhibit No. 13 marked.)
**Q. I've placed before you what's been marked as Exhibit 13. What is this?**
A. They had contacted me after the course of me leaving, and I wanted to make sure that I could keep all of my facts straight.
**Q. Let me back up. This is an e-mail from?**
A. Me to no one.
**Q. A draft e-mail?**
A. Right, so I can remember my conversation.



**Q. It's dated Friday, June 15th, correct?**
A. Yes.
**Q. And you refer to Seth reaching out to you on Thursday evening via phone, you did not answer. That would be Thursday the 14th?**
A. Thursday the 14th is when I resigned, yes.
**Q. And then he texted you on Friday, so that's the 15th?**
A. Uh-huh.
**Q. So was it the 14th then that you resigned?**
A. Yeah. I quit -- I think I was going to do it on Friday and I just -- I decided on Thursday afternoon I was -- I couldn't do it anymore.
**Q. So you -- you had an offer beginning of June, I think we said the 4th, correct?**
A. Uh-huh.
**Q. And you waited until the 14th to tell anybody that you were leaving at Randstad?**
A. Yes.
**Q. Did you tell anybody else in the meantime --**
A. No.
**Q. -- your husband or anything?**
A. No. No one at the company -- at Randstad, no one else knew.



**Q. Customers?**
A. No one knew.
**Q. Talent?**
A. No one knew. I think during the week that Seth was in town, he told me he was concerned about me and that I seemed very unhappy, and that he would consider me a -- I forget the verbiage, but like a red flag employee because I had expressed a lot of discontentment. That was it.
**Q. And you -- you continued on in your job during that ten-day period without telling anybody, correct?**
A. Correct.
**Q. Continued to have access to Randstad's information?**
A. Correct. I was out of the office in meetings, but, correct, yes.
**Q. Continued to have access to that bigwig meeting we talked about earlier?**
A. Yes.
**Q. Continued to have access to information about Randstad's customers?**
A. Yes.
**Q. And talent?**
A. Yeah. I had access to the systems.



**Q. Had access to the systems, the databases, correct?**
A. Uh-huh.
**Q. Your LinkedIn account?**
A. Yes.
**Q. And you didn't think there was anything wrong with you continuing on without telling anybody, having -- having access to these types of things for the ten days after you had already decided you were leaving?**
A. No.
MS. DEARING: Object to form.
A. I -- I wasn't in the system or in the database. I'm sure there's forensics that can show that, and I had no intention of going after any of their business.
**Q. Now, back to Exhibit 13, you say in the third paragraph, I guess, I told him I felt Chris was a lukewarm manager and not someone I felt like could motivate or inspire me. Who's Chris?**
A. Chris Fagan (phonetic).
**Q. Okay. And you said, I told him, being Seth, I took this decision very personally as I had invested so much in the people and the brand and felt very disposable and under -- excuse me, unappreciated, right?**

**Q. And do you view there being a difference between information written on a piece of paper and information in your head if it's confidential?**
MS. DEARING: Object to form.
A. No. I think on paper it would be a lot more valuable.
**Q. Than in your head?**
A. Yeah. In my head, yes.
**Q. What about -- what about your ability or right to use it, is there a difference?**
A. No.
**Q. And what is your understanding; you cannot use that?**
A. Correct.
**Q. Paragraph (d), employee has not had any communications or other contacts with any employees of a previous employer for the purpose of recruiting such employee to work for Beacon Hill in violation of any written agreement by and between employee and the previous employer.**
**Do you see that?**
A. Yes.
**Q. And you signed that that was true?**
A. Yeah, I guess I did.



**Q. But that's not true, is it?**
A. It's not, no.
**Q. And has anybody told you at Beacon Hill that anything in this agreement they didn't really mean?**
A. No.
**Q. It's all their language, right?**
A. Yes.
**Q. And, again, if you look at page 8, Section 10(d), again it refers to Massachusetts law?**
A. Uh-huh.
**Q. And (e) refers to jurisdiction, correct?**
A. Yes.
**Q. And at the time you signed this, you'd never lived or worked in Massachusetts, correct?**
A. Correct.
**Q. And the very last section here, (j), above the signatures, consultation with an attorney, did you --**
A. No.
**Q. -- consult -- no.**
**And that's your digital signature, right?**
A. Yes.
(Exhibit No. 20 marked.)
**Q. Do you recognize Exhibit 20?**
A. Yes.



**Q. What is that?**
A. It's a letter from you.
**Q. And it's dated July 24th, 2018?**
A. Yes.
**Q. About a month after you left Randstad?**
A. Yes.
**Q. And what is the -- what was your understanding of the purpose of this letter when you received it?**
A. Reminding me of my obligations to Randstad.
**Q. And it attached a copy of your agreement, right?**
A. Yes.
**Q. Did you read this letter when you got it?**
A. No.
**Q. No?**
A. I didn't.
**Q. What did you do with it?**
A. I scanned it and sent it to Charlie.
**Q. Okay. Did you read the agreement that was attached to it?**
A. I did not.
**Q. Why were you so cavalier about receiving a letter from me?**
A. I don't -- I don't know.



**Q. Did you talk to Charlie about it when you sent it?**
A. I said I got -- I received a letter from Randstad reminding me of my obligations. And he said, send it over to me.
**Q. Did he ask you if you were complying with the obligations?**
A. No.
**Q. Did he ask you why you hadn't shared this agreement with them previously?**
A. No.
**Q. Did he or anybody else at the company ask you those questions?**
A. No.
**Q. Did you respond to this letter?**
A. I did not. I think I asked how I should, and he was going to talk to Rob.
**Q. Who's Rob?**
A. Levy.
**Q. Okay. And he's another lawyer for the company, correct?**
A. Yes.
**Q. Have you talked to Rob?**
A. Only, like, once or twice.

Page 157

**Q. -- 25-mile radius, correct?**
A. Yes.
**Q. You continued after that date to solicit Randstad employees, didn't you?**
MS. DEARING: Object to form.
A. I guess that's up for interpretation, but, yes.
**Q. Have you done any work for any Randstad clients at Beacon Hill?**
**Doing work, I mean either soliciting them or actually performing services.**
A. I would have to know a name.
**Q. Okay. Well, what customers did you work with at Randstad?**
A. If you gave me a list I could say if I did or not. I know Baylor is one. I know we do not work with them and I have never had any interaction. Ugo Logistics is one, and I can say the same for them.
**Q. I'll give you a couple of names.**
A. Yeah.
**Q. What about GM Financial?**
A. No.
**Q. Keurig? Dr Pepper?**
A. No.

Page 158

**Q. McKesson US Oncology?**
A. No.
**Q. Kobie Marketing?**
A. No.
**Q. Honda?**
A. No.
**Q. I think you just referenced Zeva?**
A. No.
**Q. Xerox?**
A. No.
**Q. Ricoh?**
A. No.
**Q. Ross & Matthews?**
A. Yes.
**Q. And Novaris?**
A. No.
**Q. Do you agree that you worked with all those customers while at Randstad?**
A. I would say yes.
**Q. What work had you done with Ross & Matthews?**
A. Barely any.
**Q. But some?**
A. Yes. They pay their employees 9.50 an hour, so it's not really anything we can support.

Page 159

**Q. Okay. But how did you start doing business with Ross & Matthews?**
A. They posted a need on Indeed. We called on the need.
**Q. We being who?**
A. Me.
**Q. Did you recall at that time that you worked with them at Randstad?**
A. I did not recall at the time. I think once I started getting into it, I remembered.
**Q. And you continued on down that path even though you remembered?**
A. No. We had already staffed a few. I had never met with the client, and we are not working with them currently now.
**Q. Because there's no jobs out there or --**
A. No. There's jobs, there's lots of jobs.
**Q. Are you familiar with what the -- Randstad calls the client association list?**
A. No.
**Q. Let me ask you this before I give you the document. Are you familiar with Randstad's database and systems?**
A. Yes.

Page 160

**Q. And tell me how it would work if you were to have an interaction with a client. Would you record that in any way?**
A. You're supposed to, yes.
**Q. But you didn't always do that?**
A. Correct.
**Q. But if you did do it, it's because you had an interaction with the client, right?**
A. Yes.
**Q. And what type of information would you typically input into the system?**
A. So me, personally, or just in general?
**Q. Let's start with you, personally, what did you do?**
A. When I first started I told you I was doing some account management, so I would send clients and candidates e-mails to make sure we were doing a good job. Towards the end and when I inherited that national account team, I went on a few visits, and I think I would log in as a visit, so any calls I would make just doing compliance.
**Q. So even though you say you weren't in a production role, you were certainly doing activities that would be similar to what a person in a production**

**steps I can take to explore the opportunities in your company, I miss you and hope you have a magical weekend ahead.**
**Who is Erik, do you know?**
A. Erik Adams.
**Q. Did you know they communicated?**
A. I did know that they communicated.
**Q. What did you know about that?**
A. I wanted him to just be transparent with her about how he was having challenges and about the company.
**Q. So you put him in touch with her?**
A. No, I didn't put him in touch with her. I think -- I don't know exactly how it was, but I know she knew he came over here and they had worked together on the nonclinical team. So I'm not exactly sure how -- I didn't arrange it, but I know she was asking and I said -- I know I said at some point, like, you guys should talk, but I didn't arrange it. I'm not exactly sure how it happened.
**Q. Then at the bottom, 246, you say, I am totally in on you, I think you would love working here, we need to find you a salesperson. So you're encouraging her to work for Beacon Hill, correct?**



A. I was just being nice.
**Q. Nice but not honest?**
A. I was just being nice.
MS. DEARING: Object to form.
A. She's not the best -- she's not the -- she shouldn't be in staffing, but she's a very sweet girl.
**Q. And you said, I talked to -- this is the next text on the second page. I've talked to a few people and, obviously, if you know of anyone, let's talk. As soon as I can secure that, we can also get you in. What are you talking to a few people about?**
A. Potentially opening a Houston market.
**Q. With her?**
A. No. I was just being nice.
**Q. So you have no intentions to hire her?**
A. No.
**Q. Are you in the process right now of interviewing and/or hiring anybody from Randstad?**
A. No.
**Q. Do you have any plans to do so in the near future?**
A. No.
MR. WEIBUST: Let me look at my notes and then we can break. Okay. Let's break for lunch.



(Recess from 1:11 p.m. to 1:59 p.m.)
**Q. (BY MR. WEIBUST) Good afternoon. Do you remember you're still under oath?**
A. Yes.
**Q. So we talked about Erik Adams, correct?**
A. Previously.
**Q. Previously. And he's a defendant in this lawsuit as well?**
A. Yes.
**Q. And he previously worked with you at Randstad?**
A. Yes.
**Q. And then he joined you at Beacon Hill?**
A. Yes.
**Q. And what role did you play in his movement from Randstad to Beacon Hill?**
A. So he had also been reaching out to me, expressing unhappiness, so I had also told him I'd be open to him having conversations with Charlie.
**Q. So similar to the other employees we talked about, the ones who you were not being sarcastic with?**
A. Yes.
**Q. Like Shauna --**
MS. DEARING: Like what?
A. I was not being sarcastic with. Yes. I was



actually told, though, yeah, that -- cannot hire Erik.
**Q. Told by whom?**
A. Charlie.
**Q. But you did anyways?**
A. Yeah. He just wasn't very impressed with Erik's background.
**Q. And you -- you've been friends with Erik for a long time?**
A. Yes.
**Q. Since college?**
A. Yes.
**Q. And did you get him the job at Randstad as well?**
A. Yes.
**Q. And is he typically and generally an honest guy?**
A. Yes.
(Exhibit No. 38 marked.)
**Q. So I've placed before you Exhibit 38. Do you recognize this?**
A. Yes.
**Q. Look at the bottom -- what is it?**
A. This was an e-mail after I had let Erik go at Beacon Hill that I was helping him update his resume so

he could find new employment.
**Q. Okay. So this is after he left Beacon Hill?**
A. Correct.
**Q. Okay. Did you have any written communications with him prior to him joining Beacon Hill?**
A. I think the only communication I would have -- there's no e-mails. If anything, it was just messages.
**Q. Okay. Did you produce those?**
A. Yes.
**Q. When -- do you recall when you first spoke with Erik about joining Beacon Hill?**
A. I don't.
(Exhibit No. 39 marked.)
**Q. Do you recognize Exhibit 39?**
A. Yes.
**Q. What is that?**
A. Erik's offer letter.
**Q. And it's dated September 12th, 2018?**
A. Yes.
**Q. And it's unsigned, but it's from you?**
A. Yes.
**Q. And that's his signature down there?**
A. I believe so.
**Q. Okay. Does this refresh your memory as to**



**when you were -- first communicated with him about coming to Beacon Hill?**
A. Doesn't refresh my memory, but it was prior to September 12th.
**Q. Okay. Do you recall how far in advance it was?**
A. So when I left Randstad in June, he had no idea I was leaving. We just continued to communicate. Obviously, he was upset. He continued to reach out on multiple occasions, saying how stressful it was over there, how he was tired of all the meetings, he was unhappy, and then we started having conversations from there. So I would say August, early September.
**Q. So it was -- was it -- it was not a long time between when you first spoke with him and when you gave him the offer?**
A. No.
**Q. Okay. And the communications, as you've just told me, he initiated?**
A. Yes.
**Q. But you responded and were encouraging of him to apply?**
A. Yes.
**Q. Okay. And but you said Charlie didn't like**



**him?**
A. Charlie didn't think he would be a good fit.
**Q. So tell me, after you first spoke with Erik about joining, at some point did he -- did you put him in touch with Charlie?**
A. Yes.
**Q. How did you do that?**
A. I -- I either text -- I believe I did a quick introduction and said that they should have conversation to see if there was any potential.
**Q. Okay. And then they met?**
A. Spoke.
**Q. They spoke?**
A. They didn't meet until the holiday party.
**Q. After he had already joined?**
A. Correct.
**Q. Okay. So you understand that they had a phone call, an interview?**
A. Yeah. They -- they had just talked about Erik and what he was wanting in his career.
**Q. And do you know how many calls they had?**
A. I don't.
**Q. Do you know -- did you talk to Charlie about those call lists?**



A. I talked to Charlie about Erik and how he had expressed unhappiness, that I had obviously brought him over to Randstad as he was getting out of hockey, he was a semiprofessional hockey player. He said that -- like, he was a good friend, he was honest, and, you know, like, I would love -- I would love to help him. I felt responsible for his demise at Randstad because I recommended that he go there.
**Q. And why is it that Charlie -- what did Charlie express to you that he wasn't impressed with?**
A. He just didn't think he would be an overall good fit for the company.
**Q. But you nevertheless gave him an offer?**
A. Yes.
**Q. You had the authority to do that?**
A. We agreed to -- to give him a shot.
**Q. Okay. And he didn't last long, did he?**
A. No.
**Q. How long did he last?**
A. Not long. September, October, November, December, January, February, five months.
**Q. Okay. And what -- what was the reason he left?**
A. I felt that when he was hired at Randstad he

was supposed to be on office and administration, and he also got flipped over to dealing with health care, which, I think, was overwhelming and out of his comfort zone. I thought by taking off the very metric-driven environment he was coming from, that if he could just focus on doing sales, which is what he wanted, and just limit the distraction, he may have more success.
**Q. But he didn't?**
A. No.
**Q. Okay. And did you terminate him?**
A. Yes.
**Q. Was that hard?**
A. Very hard.
**Q. And did he -- what's he doing now?**
A. He is doing -- he's working for a VMS in a health care LocumsMart.
**Q. And when you -- when you were talking to him, leaving aside who else he spoke to, about joining Beacon Hill from Randstad, did the topic of his employment agreement with Randstad ever come up?**
A. No.
**Q. You never asked him about it?**
A. I did not.
**Q. But you were aware he signed one similar to**



**yours, correct?**
A. I -- I wasn't aware that he did sign one, but I assumed that he did as part of his onboarding.
**Q. Right. And you were -- at the time you were hiring him, you were an employee of Beacon Hill, right?**
A. At the time I was hiring him at Beacon Hill, I was an employee of Beacon Hill.
**Q. Right. You were acting on Beacon Hill's behalf to hire him?**
A. Yes.
**Q. But you didn't ask him for a copy of his agreement?**
A. I did not.
**Q. Did anybody else at Beacon Hill, to the best of your knowledge, ask him for it?**
A. I can't say. I don't believe so.
**Q. Do you know if he met with anybody other than Charlie or you?**
A. He did not, to my knowledge.
**Q. Or speak with anybody?**
A. Not to my knowledge.
**Q. Okay. Did he make any placements while he was at Beacon Hill?**
A. He, I believe, made one -- one placement.



**Q. Do you recall where?**
A. It was with a company called Bessamart (phonetic).
**Q. And was that a Randstad client?**
A. I'm not sure.
**Q. Now, you're sure that he didn't approach you? I think -- strike that.**
**You're sure that you didn't approach him to talk about this opportunity?**
A. No. He had initially -- I had told him to hear it out, try it, just stay positive, and he was the one that said he was unhappy first.
(Exhibit No. 40 marked.)
**Q. Now, you told me he was an honest guy, right?**
A. Yes.
**Q. This is a text message that he produced to us between him and somebody names James. Do you know who James might be?**
A. I don't know who James is.
**Q. Okay. So James says, why do you want to leave, what's going to be better about the new company, more money, better leads, did they approach you.**
**And Erik's response was, my old boss, Shawna, called. This is the company she switched to.**



**She would do the client development and I would recruit for the positions. She mentioned my base would be the same, but would make more money in the first months as I would all year where I'm at. They pay commission on each placement while my current company does a shared unit goal commission base that is hard to obtain with the changes that have been going on. The owner was awesome and didn't BS, was just honest on how they operate.**
**Do you see that?**
A. Yes.
**Q. So why would he have told James that you approached him?**
A. He --
MS. DEARING: Object to form.
A. Maybe ego, wanting to feel wanted, because I have messages where he clearly reached out first.
**Q. And do you know him to make things up when his ego is on the line?**
MS. DEARING: Object, form.
A. Maybe. Maybe.
**Q. So we should believe you and not him is what you're saying?**
MS. DEARING: Object to form.